31 So.2d 335

**WHITE v. STATE.**

6 Div. 496.

Supreme Court of Alabama.

June 19, 1947.

Rehearing Denied Aug. 2, 1947.

502

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

Beddow & Jones, Roderick Beddow and G. Ernest Jones, Jr., all of Birmingham, and E. L. Dodson, of Tuscaloosa, for appellant.

**BROWN, Justice.**

The appellant, William White, who will hereafter be referred to as the defendant, was indicted for the murder of his wife, Alice Evans White, the indictment charging him with murder in the first degree. The indictment charged that defendant killed the deceased "by cutting her with a knife."

The fatal rencounter between the defendant and the deceased occurred on the 14th of July, 1946, in a trailer in which the parties had lived for sometime, said trailer being parked or situated in a tourist court known as the Box Springs Tourist Camp located near Tuscaloosa, Alabama.

The testimony goes to show that prior to the afternoon of July 13, 1946, the defendant and the deceased had lived quietly and apparently happily in their trailer home. During the afternoon of that day, as the evidence goes to show, defendant and the deceased while drinking began arguing and fighting, creating disturbances until the early hours of Sunday morning, July 14th. At about 1 o'clock the owner of the tourist camp, Miller Emerson, who testified as a witness, made some effort to quiet the disturbance which was annoying other tenants of the tourist camp. At the time Emerson approached the defendant's trailer, he observed defendant pulling his wife's hair and when he (witness) attempted to interfere defendant drew a knife on him. The trouble continued at intervals until approximately 3 o'clock in the morning at which time deceased went to the apartment of Emerson, called a local hotel, made reservations for the night, called a taxi and left the scene. She returned about 1:30 the following afternoon and went into an unoccupied cabin out of the rain and while she was in said cabin Emerson took another guest who desired the cabin to the cabin and this guest left a suitcase, saying he was in no immediate hurry to occupy the cabin. Thereafter deceased discarded her top dress, threw it under the bed, took a pair of trousers out of the suitcase of the prospective guest, put them on and went back to defendant's trailer.

Soon after she returned to the trailer the fussing began in the trailer between defendant and deceased. Emerson thereupon approached the trailer, encountered defendant and engaged in a wordy altercation with him and demanded that he move his trailer from the tourist camp. Defendant replied that he had no tires for the trailer and that they then agreed that defendant would move the trailer the following day.

The evidence goes to show that the fussing and fighting between defendant and his wife continued until shortly after dark, around 7:30 and Emerson testified that while standing in his office he observed "a scuffle taking place in the trailer, that he could see the parties grappling each other and as he watched deceased came from the trailer and staggered toward him with the exclamation 'He has cut my throat'." Emerson then called the police and soon thereafter they arrived at the scene and found the body of deceased lying on the ground; observed defendant's automobile pulling away from the tourist camp; followed and arrested him. At the time he had in his possession a rifle, loaded and cocked, and cartridges for the rifle in his pocket. Defendant stated at the time he was arrested that he was on his way to give up to the authorities and told them that if the deceased was cut, it was an accident.

The officers after placing the defendant in jail returned to the scene and their testimony goes to show that the trailer showed signs of a struggle and that blood was found throughout the trailer, upon bottles, furniture and the floor. That they found in the trailer a butcher knife, the blade of which was broken from the handle and covered with blood. Two suitcases apparently partially packed with deceased's wearing apparel were found upon the bed of the trailer. There was evidence also going to show that other occupants of the tourist camp heard defendant make threats against the deceased. That the parties (defendant

and his wife) had been drinking for about 24 hours.

The defendant testified in his own behalf as to the drinking during the night of July 13th and the day preceding deceased's death. That he called local authorities to have them come and help him with her and called her foster parents over the telephone who lived in Georgia telling them of his plight; that he was constantly abused and attacked by the deceased during the period and at the time of his difficulty he was attacked with a butcher knife and he was merely defending himself and had no knowledge of inflicting the wound upon the deceased causing her death.

■ The solicitor offered in evidence two bottles with blood stains found in the trailer where the fatal rencounter occurred, a rifle which was taken from the defendant at the time of his arrest and the butcher knife and handle showing blood stains. The defendant insists that in permitting these objects in evidence the court committed error. This contention cannot be sustained. The killing occurred in the trailer when there was no one therein except the defendant and the deceased. The bottles and the knife taken from the trailer in connection with the testimony going to show a struggle and blood splattered throughout the trailer, tended to give character to and illustrate the testimony showing the gravity of the rencounter between the deceased and the defendant. And the rifle which was taken from the defendant at the time of his arrest tended to illustrate defendant's state of mind at the time of and immediately following the fatal rencounter. Floyd v. State, 245 Ala. 646, 18 So.2d 392.

■ The defendant on cross-examination of witness Emerson questioned him about the wet garment, a black dress, which was thrown or kicked under the bed in the cabin where deceased left it. The defendant's counsel during the course of the cross-examination intimated and attempted to show that the dress was torn or ripped, and the solicitor on redirect offered the dress in evidence to rebut any such imputation. The court did not err in allowing this garment in evidence.

■ The defendant also insists that the court erred in overruling his objection to the question put to the witness Emerson by the solicitor, "You saw Mr. White slashing at her through the door?" The witness had previously testified in respect to what he observed between defendant and deceased during the struggle which he referred to as "cutting, snatching and jerking." Defendant's objection to this evidence was overruled without error. It is a well-settled rule that " * * * Where a fact cannot be reproduced and made apparent to the jury, a witness may describe the fact according to the effect produced on his mind; or if, from the nature of a particular fact, better evidence is not attainable, the opinion of a witness derived from observation, is admissible. * * *" Mayberry v. State, 107 Ala. 64, 67, 18 So. 219, 220.

■ After deliberating the jury returned the following verdict:

"We, the Jury, find the defendant guilty as charged in the indictment and fix the penalty at life imprisonment in the State penitentiary." The court then instructed the jury: "Gentlemen, I guess you had better go back. You didn't say of which degree. You didn't say whether it was murder or manslaughter. Now, I believe your verdict would stand, but it is better to say what you find him guilty of. You have said 'as charged in the indictment', but you see, the indictment, as I told you, includes four charges. Suppose you go back and amend your verdict to say which charge. Now, let me go over them again. If you find him guilty of murder in the first degree, it would be, 'We, the Jury, find the defendant guilty of murder in the first degree as charged in the indictment, and fix his punishment at—' and then you fix the punishment. If it is murder in the second degree, it would be, 'We, the Jury, find the defendant guilty of murder in the second degree as charged in the indictment and fix the punishment at—' and, of course, that would have to be some years in the penitentiary. If it is manslaughter in the first degree, 'We, the Jury, find the defendant guilty of manslaughter in the first degree as charged in the indictment'; of man-

slaughter in the second degree, 'We, the Jury, find the defendant guilty of manslaughter in the second degree', but your verdict should state which charge, whether you find him guilty of murder or manslaughter and what degree it is. Now, if you find him guilty of murder in the first degree, then the punishment is either the electric chair or imprisonment in the penitentiary for life. So, before you could fix a penalty at imprisonment for life, it would be necessary to say 'We, the Jury, find the defendant guilty of murder in the first degree as charged in the indictment and fix his punishment at life imprisonment in the state penitentiary', but that is the only way you can fix it at life imprisonment. So, I believe I will let you retire and correct the verdict. * * *"

Assuming without deciding that the exception to the oral charge which followed applies to these instructions, it is clear that there is no merit in the appellant's contention that these instructions confined the jury's consideration to murder in the first degree or acquittal.

The foregoing covers all questions presented in brief and argument and we have examined the record for errors and find no errors therein. The judgment of the circuit court is due to be affirmed. It is so ordered.

Affirmed.

GARDNER, C. J., and LIVINGSTON and SIMPSON, JJ., concur.